U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2024 SEP 13 PM 3: 52

CLERK

BY _____ _____
        DEPUTY CLERK

UNITED STATES OF AMERICA

v.

Docket No. $2:24$-$cr$-$100$-$cr$

JEREMY BROWN,
Defendant.

## PLEA AGREEMENT

The United States of America, by and through the United States Attorney for the District of Vermont (hereafter "the United States"), and the defendant, JEREMY BROWN, agree to the following in regard to the disposition of pending criminal charges.

1. JEREMY BROWN agrees to waive Indictment and plead guilty to Count 1 of the Information charging him with introducing or causing the introduction of unapproved new drugs into interstate commerce with intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(d), 333(a)(2), and 355(a).

2. JEREMY BROWN understands, agrees and has had explained to him by counsel that the Court may impose the following sentence on his plea: up to 3 years of imprisonment, pursuant to 21 U.S.C. § 333(a)(2); up to one year of supervised release, pursuant to 18 U.S.C. § 3583(b)(3); up to a $250,000 fine, pursuant to 18 U.S.C. § 3571(b)(3); and a $100 special assessment pursuant to 18 U.S.C. § 3013.

3. JEREMY BROWN agrees to plead guilty because he is, in fact, guilty of the above crime.

4. JEREMY BROWN stipulates to, agrees with, and admits the following facts:

1

a. Beginning in March 2019 and until December 2023, JEREMY BROWN, alone, owned and operated the company Warrior Labz SARMs and the website warriorlabzsarms.com (the "Original SARMs Site"), which offered for sale drugs including numerous Selective Androgen Receptor Modulators ("SARMs"), including Cardarine, Ostarine, Ligandrol, and YK-11. At all times relevant to this case, BROWN operated the Original SARMs Site from California, where he resided.

b. At all times relevant to this case, SARMs comprised a class of compounds with properties similar to those of anabolic steroids.

c. Statements on the Original SARMs Site indicated that the SARMs sold there were intended to affect the structure or function of the human body by, among other things, increasing lean muscle mass, increasing strength, and promoting faster muscle recovery.

d. JEREMY BROWN also offered for sale through the Original SARMs Site Viagra-Max Sildenafil and Cialis-Max Tadalafil, which were unapproved versions of the prescription drugs Viagra and Cialis, respectively, that were approved by the Food and Drug Administration ("FDA") for use to treat erectile dysfunction.

e. JEREMY BROWN also offered for sale through the Original SARMs Site semaglutide, an unapproved version of the active pharmaceutical ingredient in the FDA-approved prescription drugs Ozempic, Wegovy, and Rybelsus.

f. JEREMY BROWN included on the Original SARMs Site several disclaimers that falsely stated that the drugs offered for sale were for "research purposes only" and

2

"not for human consumption." JEREMY BROWN knew that these statements were false and misleading.

g. In January 2023, JEREMY BROWN created the website warriorlabzvip.com (the "VIP SARMs Site"), for which he required customers to create a username and password. He operated the VIP SARMs Site until December 2023. At all times relevant to this case, BROWN operated the VIP SARMs Site from California, where he resided.

h. JEREMY BROWN offered for sale through the VIP SARMs Site the same drugs he offered for sale through the Original SARMs Site, alongside similar claims that the drugs would affect the structure or function of the human body.

i. JEREMY BROWN also included on the VIP SARMs Site false disclaimers, which he knew to be false, stating that the drugs were for "research purposes only" and "not for human consumption."

j. None of the drugs JEREMY BROWN sold through the Original SARMs Site or the VIP SARMs Site (together, the "SARMs Sites") were approved by the FDA.

k. None of the drugs sold by the SARMs Sites were generally recognized among qualified experts as safe and effective for use under the conditions prescribed, recommended, or suggested by the SARMs Sites or on any other labeling.

l. JEREMY BROWN obtained the bulk of the drugs he sold through the SARMs Sites from China. BROWN did not ask his Chinese suppliers about the shipping or storage conditions of the drugs he obtained from them, nor did he use a lab or other method to verify the contents of the drugs he received from China. The Original SARMs Site, however, included assertions that Warrior Labz SARMs

3

used only the highest quality pharmaceutical grade ingredients and U.S. manufacturing practices. BROWN knew that these assertions were false. Labeling on the drugs BROWN sold through the SARMs Sites stated that the drugs were made in the United States. BROWN also knew that these claims was false.

m. On June 12, 2023, JEREMY BROWN received a Warning Letter from the FDA. The Warning Letter stated that the FDA had reviewed the Original SARMs Site and determined that products the site offered for sale, including Ostarine and Ligandrol, were "new drugs" under the Food, Drug, and Cosmetic Act ("FDCA"), unapproved by the FDA, and sold in violation of the FDCA.

n. The Warning Letter further stated that, although these products were marketed on the Original SARMs Site as for "research purpose only" and "not for human consumption," other evidence obtained from the site established that the products were, in fact, intended for human use in that they were intended to affect the structure and/or function of the body.

o. The Warning Letter advised JEREMY BROWN that the FDA had safety concerns about products containing SARMs, including possible life-threatening reactions and the potential to increase the risk of heart attack and stroke.

p. The Warning Letter stated that it was not intended to be an all-inclusive statement of violations that may exist in connection with JEREMY BROWN's products. It informed BROWN that he was responsible for investigating and determining the causes of any violations, preventing their recurrence, preventing the occurrence of

4

other violations, and ensuring that his company complied with all requirements of federal law, including FDA regulations.

q. The Warning Letter advised JEREMY BROWN to take immediate action, and to notify the FDA of the steps taken, to correct the violations.

r. JEREMY BROWN read and fully understood the Warning Letter.

s. After receiving the Warning Letter, JEREMY BROWN continued to operate the Original SARMs Site but no longer listed Viagra-Max Sildenafil, Cialis-Max Tadalafil, or semaglutide for sale. JEREMY BROWN continued to offer SARMs through the Original SARMs Site but removed from that site claims that the products were intended to affect the structure and/or function of the human body.

t. After receiving the Warning Letter, JEREMY BROWN continued, however, to operate the VIP SARMs Site in the same manner as before receiving the Warning Letter, including by continuing to offer for sale SARMs alongside claims that they were intended to affect the structure and/or function of the human body.

u. After receiving the Warning Letter, JEREMY BROWN directed customers of the Original SARMs Site to the VIP SARMs Site.

v. On June 26, 2023, JEREMY BROWN responded to the Warning Letter, stating that he had taken corrective action to address the violations cited in the Warning Letter. JEREMY BROWN knew that this statement was misleading, and he intended it to be misleading.

w. Between March 2023 and December 2023, JEREMY BROWN made numerous sales to an FDA undercover investigator posing as a customer of the SARMs Sites. JEREMY BROWN filled those orders by accepting payment for them and

5

shipping them from California to addresses provided by the FDA undercover account, which were located in Vermont and New Hampshire.

    i. On March 29, 2023, the FDA account purchased semaglutide from the Original SARMs Site. JEREMY BROWN filled the order and shipped it from California to the address the FDA account provided in New Hampshire. On April 5, 2023, the FDA agent who operated the account retrieved the order from the New Hampshire address.

    ii. On August 4, 2023, the FDA account purchased semaglutide, Ostarine, and Ligandrol from the VIP SARMs Site. JEREMY BROWN filled the order and shipped it from California to the address the FDA account provided in Vermont. On August 10, 2023, the FDA agent who operated the account retrieved the order from the Vermont address.

    iii. On September 29, 2023, the FDA account purchased semaglutide, Ostarine, and Ligandrol, among other drugs, through the VIP SARMs Site. JEREMY BROWN filled the order and shipped it from California to the address the FDA account provided in Vermont. On October 5, 2023, FDA agents retrieved the order from the Vermont address.

    iv. On December 1, 2023, the FDA account purchased Ostarine, Ligandrol, and Cialis-Max Tadalafil, among other drugs, through the VIP SARMs Site. JEREMY BROWN filled the order and shipped it from California to the address the FDA account provided in Vermont. On December 6, 2023, the FDA agent who operated the account retrieved the order from the Vermont address.

x.  In connection with the December 1, 2023, order, the FDA account communicated with JEREMY BROWN by email. In those communications, the FDA account asked JEREMY BROWN for assurance that what the account was ordering was not illegal. BROWN responded by saying that the products the account was ordering posed "no issues" and "were all sold at supplement stores across USA and Europe," and that the account was in "good hands" with BROWN's business. Brown knew that these statements were false and misleading.

y.  FDA laboratories tested the SARMs and other drugs obtained from the SARMs Sites. Many tested positive for substances not listed on the Warrior Labz SARMs labels; some were found not to contain any of the ingredients listed on those labels. For example, of the substances received in Vermont from the August 2023 order – one labeled as containing Ostarine and the other Ligandrol, neither contained Ligandrol, and both contained Ostarine and a substance not included on the label – Clomiphene, an unapproved version of a prescription drug approved by the FDA to treat infertility by inducing ovulation.

z.  Between March 2019 and December 2023, JEREMY BROWN received at least $1,183,985.60 from his sales of unapproved new drugs through the SARMs Sites.

aa. JEREMY BROWN introduced those drugs into interstate commerce with the intent to defraud and mislead:

   i.  His customers, to whom he falsely stated via the Original SARMs Site that Warrior Labz SARMs used only the highest quality pharmaceutical grade ingredients and U.S. manufacturing practices and, via the labeling on the drugs sold, that the drugs were made in the United States;

7

      ii. The undercover FDA account, to which the foregoing quality statements were also directed, and which BROWN assured specifically of the legality of the drugs he was selling; and

      iii. The FDA, which BROWN assured of his compliance with applicable laws in June 2023.

    bb. Therefore, between, at least, on or about August 4, 2023, and on or about August 10, 2023, JEREMY BROWN sold through interstate commerce, from California to Vermont, new drugs that were not approved by the FDA, and he did so with the intent to defraud and mislead his customers, the undercover FDA account, and the FDA.

5. JEREMY BROWN understands that it is a condition of this agreement that he refrain from committing any further crimes, whether federal, state or local, and that if on release he will abide by all conditions of release.

6. JEREMY BROWN acknowledges that he understands the nature of the charges to which he will plead guilty and the possible penalties. He also acknowledges that he has the following rights: the right to persist in a plea of not guilty; the right to a jury trial; the right to be represented by counsel and if necessary have the court appoint counsel at trial and at every other stage of the proceeding; the right at trial to confront and cross-examine adverse witnesses; the right to be protected from compelled self-incrimination; and the right to testify and present evidence and to compel the attendance of witnesses. He understands that by pleading guilty, he will waive these rights. He also understands that if his guilty plea is accepted by the Court, there will be no trial and the question of guilt will be resolved; all that will remain will be the Court's imposition of sentence.

8

7. JEREMY BROWN fully understands that he may not withdraw his plea because the
Court declines to follow any recommendation, motion, or stipulation of the parties to this
agreement, other than an agreement between the parties pursuant to Federal Rule of Criminal
Procedure 11(c)(1)(C). The United States specifically reserves the right to allocute at sentencing.
There shall be no limit on the information the United States may present to the Court and the
Probation Office relevant to sentencing and no limit (except as otherwise provided in this
agreement) on the positions the government may take at sentencing. Both parties are free to
move for a departure under the Guidelines and to argue for a sentence outside the advisory
sentencing range, except as otherwise set forth in this agreement. The United States also
reserves the right to correct any misstatement of fact made during the sentencing process, to
oppose any motion to withdraw a plea of guilty, and to support on appeal any decisions of the
sentencing Court whether in agreement or in conflict with recommendations and stipulations of
the parties.

8. JEREMY BROWN fully understands that any estimates or predictions relative to the
Guidelines calculations are not binding upon the Court. JEREMY BROWN acknowledges that
there is no agreement between the parties as to both the calculation of the offense level and the
defendant's criminal history category. JEREMY BROWN understands his criminal history
could impact both the offense level and the criminal history category applicable to his Guideline
calculation. He fully understands that the Guidelines are advisory and that the Court can consider
any and all information that it deems relevant to the sentencing determination. He acknowledges
that in the event that any estimates or predictions by his attorney (or anyone else) are erroneous,
those erroneous predictions will not provide grounds for withdrawal of his plea of guilty,
modification of his sentence, or for appellate or post-conviction relief.

9

9. Upon demand, JEREMY BROWN shall furnish the United States Attorney's Office a personal financial statement and supporting documents relevant to the ability to satisfy any fine or restitution that may be imposed in this case. JEREMY BROWN expressly authorizes the United States Attorney's Office to obtain a credit report on him at any time before or after sentencing in order to evaluate his ability to satisfy any financial obligation imposed by the court. If the court orders restitution and/or a fine due and payable immediately, JEREMY BROWN agrees that the U.S. Attorney's Office is not precluded from pursuing any other means by which to satisfy his full and immediately enforceable financial obligation. JEREMY BROWN understands that he has a continuing obligation to pay in full as soon as possible any financial obligation imposed by the court.

10. JEREMY BROWN agrees to provide the Clerk's office, at the time this plea agreement is executed, a bank cashier's check, certified check, or postal money order payable to the Clerk, United States District Court, in payment for the mandatory special assessment of $100 for which he will be responsible when sentenced. He understands and agrees that, if he fails to pay the special assessment in full prior to sentencing, the sentencing recommendation obligations of the United States under this plea agreement will be terminated, and the United States will have the right to recommend that the Court impose any lawful sentence. Under such circumstances, he will have no right to withdraw his plea of guilty.

11. JEREMY BROWN recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. The defendant, if not a United States citizen, may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Removal and other immigration consequences are the subject of a separate proceeding, however, and he understands that no one, including his attorney or the

10

district court, can predict to a certainty the effect of his conviction on his immigration status. JEREMY BROWN nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is his automatic removal from the United States.

12. The United States agrees that in the event that JEREMY BROWN fully and completely abides by all conditions of this agreement, the United States will:

        a. not file additional federal charges in the District of Vermont based on the conduct described in the factual stipulations at paragraph 4 and for violations of 21 U.S.C. §§ 331(a), 331(d), 333(a), or 355(a) between March 2019 and January 2024 committed by him in the District of Vermont;

        b. recommend that he receive a two-point credit for acceptance of responsibility under Guideline § 3E1.1(a), provided that (1) he cooperates truthfully and completely with the Probation Office during the presentence investigation, including truthfully admitting the conduct comprising the offense(s) of conviction and not falsely denying any relevant conduct for which he is accountable under U.S.S.G. § 1B1.3, (2) he abides by the conditions of his release, and (3) provided that no new information comes to the attention of the United States relative to the issue of his receiving credit for acceptance of responsibility; and

        c. move for an additional one-point credit for timely acceptance of responsibility, if the offense level (before acceptance) is 16 or greater and he meets the conditions in the subparagraph above.

13. If the United States determines, in its sole discretion, that JEREMY BROWN has committed any offense after the date of this agreement, has violated any condition of release, or

11

has provided any intentionally false information to Probation, the obligations of the United States
in this agreement will be void. The United States will have the right to recommend that the Court
impose any sentence authorized by law and will have the right to prosecute him for any other
offenses he may have committed in the District of Vermont. JEREMY BROWN understands and
agrees that, under such circumstances, he will have no right to withdraw his previously entered
plea of guilty.

14. JEREMY BROWN and the United States agree, pursuant to Fed. R. Crim. P. 11(c)(1)(C),
that the appropriate term of imprisonment the Court should impose is time served. Under this
agreement, the Court retains discretion with all other aspects of the sentence, including the fine,
the restitution, and the term of supervised release. The defendant further understands that if the
court rejects the plea agreement on the agreed upon sentencing stipulation, the United States may
deem the plea agreement null and void.

15. JEREMY BROWN acknowledges and consents to the criminal forfeiture of the property
named in the Forfeiture Notice of the Information, as discussed more fully below:

> a. The United States and JEREMY BROWN stipulate and agree that the United
> States is entitled to forfeiture of a money judgment, as set forth in the Forfeiture
> Notice of the Information, in the amount of $100,000 ("the money judgment"), as
> property constituting, or derived from, any proceeds obtained, directly or
> indirectly, as a result of the conduct described above in paragraph 4. JEREMY
> BROWN agrees to pay, no later than 30 days prior to the date of his sentencing
> hearing, $92,000 by check payable to the United States Marshals Service.
> JEREMY BROWN further agrees to pay the remaining $8,000 of the money
> judgment, also by check payable to the United States Marshals Service, in

12

monthly installments to be completed by the one-year anniversary of his
sentencing hearing. The agreed amount of the money judgment is not an
agreement or stipulation to be used for any other purpose, including calculation of
the sentencing guidelines.

b.  The United States and JEREMY BROWN stipulate and agree that the United
States is entitled to forfeiture of any and all misbranded drugs and unapproved
new drugs that were introduced or delivered for introduction into interstate
commerce contrary to the provisions of 21 U.S.C. § 331 ("the property").

c.  JEREMY BROWN agrees that the property may be forfeited immediately and
that the forfeiture need not wait until he is sentenced. JEREMY BROWN further
agrees that if for any reason the criminal forfeiture of the property cannot be
accomplished, the United States may at any time (without regard to any statute of
limitations or doctrine of laches) bring a civil forfeiture complaint against the
property. In the event of any such filing, JEREMY BROWN will not file a claim
nor contest the forfeiture in any way and will not cause any other person to file a
claim or contest the forfeiture.

d.  JEREMY BROWN agrees that by entering into this plea agreement, he
voluntarily and knowingly waives any claim he may have that the forfeiture,
administrative or judicial, civil or criminal, of the property, in any way violates
any of his rights, including his rights under the Fifth and Eighth Amendments to
the United States Constitution, including that such forfeiture, whether preceding
or following this criminal prosecution, would constitute double jeopardy, cruel
and unusual punishment, an excessive fine, a disproportionate punishment, or a

violation of due process. JEREMY BROWN acknowledges and agrees that he has no constitutional right to a jury trial on the forfeiture of assets, and waives all constitutional, legal, and equitable defenses to the forfeiture of the property and the entry of the money judgment in any proceeding.

e.  JEREMY BROWN agrees that the forfeiture of the property and entry of the agreed money judgement shall not be deemed as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose in addition to forfeiture.

f.  JEREMY BROWN agrees to hold the United States, its agents, and employees, and any state or local law enforcement agency participating in the investigation and prosecution of this case, harmless from any claims whatsoever in connection with the seizure and forfeiture, as well as the seizure, detention, and return, of any property in connection with the investigation and prosecution of this case.

16. It is understood and agreed by the parties that should JEREMY BROWN'S plea not be accepted by the Court for whatever reason, or later be withdrawn or vacated; this agreement may be voided at the option of the United States and he may be prosecuted for any and all offenses otherwise permissible. JEREMY BROWN also agrees that the statute of limitations for all uncharged criminal offenses known to the United States as of the date it signs this plea agreement will be tolled for the entire period of time that elapses between the signing of this agreement and the completion of the period for timely filing a petition under 28 U.S.C. § 2255, or if such petition is filed, the date of any decision by a court to vacate the plea or the conviction.

14

17. It is further understood that this agreement is limited to the Office of the United States Attorney for the District of Vermont and cannot bind other federal, state or local prosecuting authorities.

18. JEREMY BROWN expressly states that he makes this agreement of his own free will, with full knowledge and understanding of the agreement and with the advice and assistance of his counsel, Rick Collins, Esq., and Lisa B. Shelkrot, Esq. JEREMY BROWN further states that his plea of guilty is not the result of any threats or of any promises beyond the provisions of this agreement. Furthermore, JEREMY BROWN expressly states that he is fully satisfied with the representation provided by his attorneys, Rick Collins, Esq., and Lisa B. Shelkrot, Esq., and has had full opportunity to consult with his attorneys concerning this agreement, concerning the applicability and impact of the Sentencing Guidelines (including, but not limited to, the relevant conduct provisions of Guideline Section 1B1.3), and concerning the potential terms and conditions of supervised release.

19. No agreements have been made by the parties or their counsel other than those contained herein or in any written agreement supplementing this agreement.

UNITED STATES OF AMERICA

NIKOLAS P. KEREST
United States Attorney

9/13/2024

Date

By: _____

Corinne M. Smith
Assistant U.S. Attorney

9/4/2024

Date

_____

Jeremy Brown
Defendant

15

I have read, fully reviewed and explained this agreement to my client, Jeremy Brown. I believe that he understands the agreement and is entering into the agreement voluntarily and knowingly.

9/5/24
Date

Rick Collins
Counsel for the Defendant

9/6/24
Date

(solely in role as local counsel)

Lisa B. Shelkrot
Counsel for the Defendant

16